## GENERAL INS. CORPORATION v. LANEY.

### No. 15067.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 21, 1949.

Rehearing Denied Dec. 2, 1949.

Cantey, Hanger, Johnson, Scarborough & Gooch, J. A. Gooch, and Charles L. Stephens, all of Fort Worth, for appellant.

Samuels, Brown, Herman & Scott and William M. Brown, all of Fort Worth, for appellee.

SPEER, Justice.

Hubert Laney sued General Insurance Corporation for breach of contract and damages alleged to have resulted from the breach.

Our references to the parties will be the same as they were designated in the trial court. It will be necessary to make frequent references to the Pacific Finance Corporation, although that corporation was not a party to the suits; for brevity we shall refer to it as Pacific unless otherwise designated.

At all times pertinent here, plaintiff was engaged in underwriting, preparing and delivering policies of insurance in the name of defendant under a contract with defendant to do so, covering various forms of automobile insurance. Defendant was engaged in such insurance business. Pacific Finance Corporation was engaged in lending money on the financing and purchase of automobiles and required its customers to carry insurance on such automobiles, providing for loss payable to Pacific as mortgagee.

Plaintiff was a man of long experience in the appraisal of values and the insurance risks of automobiles when considered in connection with the owners. Knowledge of these things caused both defendant and Pacific to highly regard plaintiff's judgment and integrity in such matters.

On March 1, 1945, plaintiff and defendant entered into a written contract under which plaintiff became the local agent of defendant; the contract set out many obligations, duties and responsibilities of each of the parties. Among other things, plaintiff was to receive the printed supplies and advertising matter of defendant and should inspect, appraise and pass upon risks for insurance purposes, and, if approved by him, to prepare and deliver defendant's policies of insurance, collect the premiums thereon and account to defendant in written reports at specified times. The defendant could reject any risk written by plaintiff and could revoke plaintiff's right to issue policies. Either party could by written notice to the other cancel the whole contract. Plaintiff was to receive as full compensation for his services certain commissions on the net premiums on the various policies written by him. These commissions were: "* * * Automobiles—all coverage 30% * * * And Finance Business (automobile) 17½%."

On March 8, 1945, the original contract was amended by letter from defendant, the terms of which were accepted by plaintiff. By this letter plaintiff's commission on "Pacific Finance Corporation business for and after March 1, 1945, will be 17½%." The letter also contained this language: "We also, in writing, confirm our heretofore verbal agreement that we will not at any time resort to wholesale cancellaton of the Pacific Finance Corporation business. Should we find it necessary, we reserve the right to discontinue writing the business, but we will permit the business on our books at that time to run to its normal expiration."

On February 13, 1946, the contract was again amended by letter of that date from defendent, the terms of which were ac--

cepted by plaintiff. That letter, among other things, provided in substance that the Pacific automobile insurance business had from its inception proved to be highly undesirable from a loss ratio standpoint and expressed the desire of defendant to "withdraw" from writing any of Pacific's business except under the following conditions:

"(1) That the commission be reduced, effective February 13, 1946, to 5% instead of 17½% as previously paid.

"(2) * * *

"(3) We will continue carefully underwriting the business and will be given all 1946 and 1947 model cars insured through the Fort Worth Branch, up to and including December 31, 1946.

"We agree to reiterate our agreement that we will not wholesale cancel this account at any time, but in the event that we should choose to withdraw, we will give ten (10) days notice and proceed to cancel a proportionate part of the account as it can be replaced by the mortgagee. However, we do reserve the right to decline the acceptance of any risks submitted to us through this source, and cancel any business which we find to be undesirable. * * * "

The original contract of March 1, 1945 and the two letters of March 8, 1945 and February 13, 1946, respectively, as amendments, were plead by plaintiff as constituting the contract alleged to have been breached by defendant resulting in the damages sought to be recovered.

Trial was to a jury on three special issues and some explanations by the court, resulting in a verdict for plaintiff for $4,000, upon which verdict judgment was entered and defendant has appealed.

After a close study of the record, we have reached the conclusion that there was no breach of the contract by defendant and that defendant's timely motion for an instructed verdict should have been sustained.

As we view this record, there was no material conflict in the testimony. Apparently the principal difference between the parties lies in the interpretation which has been placed on certain language found in the letters of amendment, more especially those provisions referable to "wholesale cancellation of the Pacific Finance Corporation business" and a clause in the first mentioned letter referable to permitting current policies to run until normal expiration.

We deem it proper to make a rather full statement of the undisputed facts which we think are controlling in this case.

Because of the confidence reposed by defendant in plaintiff's experience and integrity in such matters, defendant entered into the contract; both parties believed Pacific's business was very attractive and that plaintiff would be able to write their business. In fact, plaintiff was able to procure substantially all of Pacific's business after March 1, 1945 and write the policies for defendant. Apparently plaintiff wrote approximately 1550 policies during 1946 prior to April of that year, on automobiles in which Pacific was mortgagee. Plaintiff's commissions on net premiums of "Pacific Finance Corporation business" were reduced from 17½% to 5% by the terms of the February 13, 1946 letter; the same letter declared that the Pacific policies at that time had proven to defendant to be "highly undesirable from a loss ratio standpoint." That an insurer necessarily pays out about 40% of the normal premium fixed on the rates established by the Board of Insurance Commissioners for agent's commissions and overhead expense, and the remaining 60% is to cover losses. When this happens the insurer breaks approximately even. In February, 1946, defendant's losses on Pacific's business had far exceeded the 60% loss ratio and had later reached 90% ratio and at the time the letter of February 13, 1946 was written the loss was running around 160% ratio. All parties said such a loss ratio was very bad and disastrous to the insurer—in short was very undesirable business. That every policy issued by plaintiff in the Pacific's lines (as was required by the Board of Insurance Commissioners) provided at paragraph 23 on page 3 of the policy that the insurer could cancel the policy by giving notice of such intention in the manner therein set out. It is quite apparent from

the undisputed testimony that Pacific's automobile business was potentially an attractive line as far as volume was concerned; it also appears that Pacific would not give to plaintiff its exclusive line for defendant without some assurance that their many policies would not be canceled out by defendant "wholesale" and thus leave Pacific without coverage and protection; this understanding prompted the amendatory letters by defendant promising not to resort to "wholesale cancellation." In the last amendatory letter it will be noted that in connection with the expression "wholesale cancellation" this is said: "We agree to reiterate our agreement that we will not wholesale cancel this account at any time, but in the event that we should choose to withdraw, we will give ten (10) days notice and proceed to cancel a proportionate part of the account as it can be replaced by the mortgagee. However, we do reserve the right to decline the acceptance of any risks submitted to us through this source, and cancel any business which we find to be undesirable." Thus it is seen that in the event defendant should withdraw, meaning, we think, if defendant exercised its reserved right to cancel policies which it found to be undesirable, it would "give ten (10) days notice and proceed to cancel a proportionate part of the account as it can be replaced by the mortgagee."

On April 16, 1946, defendant wrote plaintiff this letter:

"Dear Mr. Laney: We regret very much to have to advise you that the Pacific Finance business has proven so undesirable that we must ask to be excused from any future submissions on this line.

"This letter is to advise you that we will no longer accept business on this account, therefore, our agreement to handle this business, as outlined in our letter of February 13, is hereby cancelled in accordance with the terms thereof.

"We will proceed to re-underwrite the business, and will notify you of what individual risks we desire to be relieved of liability."

On April 17, 1946, plaintiff wrote Pacific advising it of the contents of defendant's letter of April 16, 1946, and added this paragraph: "We feel the Company has been particularly co-operative in their efforts to handle this business for us; consequently, we are confident you will make every effort to secure another good carrier for this coverage before the expiration of the ten day notice period provided in their agreement."

On April 23, 1946, defendant wrote plaintiff as follows:

"Dear Mr. Laney: Please arrange for replacement of liability on the attached lists of risks within ten days." The attached list contained nearly 100 policy numbers and names of policy holders.

On April 25, 1946, defendant wrote a similar letter to plaintiff, attaching a list of approximately 200 policy numbers and names. On April 26 and 29 following, similar letters and lists were sent by defendant to plaintiff, the two containing approximately 300 policy numbers and names. Over a period of sixty to ninety days, ending in June, 1946, defendant had sent plaintiff such letters and lists, aggregating about 1328 policy numbers and names, requesting that it be relieved of liability and that the coverage be placed elsewhere. It is admitted by both parties that all said coverages were replaced by Pacific, with plaintiff's assistance, before the expiration of ten days from the date of each request. Plaintiff received a commission for replacing a limited number of these policies, the number and amounts are not shown. Approximately 200 to 250 policies were not canceled because they would expire at such a near future date cancellation was thought unnecessary.

The testimony of each of the parties, and there was none to the contrary, shows conclusively that when a policy is written in the form prescribed by the Board of Insurance Commissioners, it necessarily contains a provision under which either the insurer or the insured can cancel it; that when canceled the insured is entitled to receive back a proportionate part of the contractual premium he has paid. That

although the insurer has received the premium in full and the agent his commission, upon cancellation the insurer and the agent must repay to the insured their respective proportionate parts of the unearned premium; that plaintiff knew this at all times and from experience he knew it was one of the hazards of the insurance business.

In connection with the cancellation of policies by defendant, its president testified in effect that it was the intention of the company to cancel the policies at the times of the several letters, under the existing conditions, and that it would have done so if its officers had not had any discussions of the matter with plaintiff. This witness also said substantially that defendant never made any unconditional promise not to cancel any of the policies since it could not make such a promise under the terms of the standard insurance policies. It will be noted that neither any policy holder nor the mortgagee is complaining in this case because of the manner in which the policies were canceled.

There was testimony by defendant's president that at a visit to Pacific's place of business, he saw his supply of policies, applications and forms at Pacific's place of business and he feared Pacific was underwriting the business and not his trusted agent, the plaintiff. None of this was denied yet because the testimony came from an interested witness we do not rely upon it in reaching our decision in this case.

It appears to us that plaintiff's principal contentions, in support of the judgment rendered, are: (1) In the letter of March 8, 1945, the first amendment of the original contract, it was stated in effect that if defendant should find it necessary to discontinue writing the Pacific's business it would permit the business on its books at that time to run to its normal expiration; and (2) the manner in which defendant canceled existing policies was "wholesale cancellation" and violative of the provision in both amendatory letters.

Each of the foregoing provisions is found in the two letters referred to and if they stood alone, without modification

or limitations, perhaps a different situation to the one before us would be presented, but since that is not the case under consideration we do not decide it here.

The Legislature has delegated to the Board of Insurance Commissioners of this state full and complete authority to fix and promulgate rates, premiums and necessary provisions for and to be contained in effective standard policies of insurance in this state. Art. 4682b, Vern.Ann.Civ.St. By section 5 of Art. 4682b, it is provided in effect that any contract violative of the terms of the prescribed form in the standard policy if "not written into the application and policy shall be void and of no effect and in violation of the provisions of this Act * * *." See also Pacific Fire Insurance Co. v. Donald, Tex.Sup., 224 S.W.2d 204; Lundin v. Ætna Insurance Co., 7 Cir., 57 F.2d 959.

It was indisputably established upon the trial that the policies written by plaintiff for defendant and involved here were "standard forms," such as prescribed by the Board of Insurance Commissioners. Any form of contract in conflict therewith would have been ineffective; each policy written was standard form and contained the optional cancellation clause effective as to both the insured and insurer, and if either party to a policy should contract with the other not to cancel it would have been violative of the terms of the standard policy and would have been ineffective. So to give the effect claimed by plaintiff to the clause in the letter of March 8, that defendant would let all policies run to normal termination from a given time, would be giving effect to a contract not to cancel, which would be violative of the provisions of such standard form policies as were established by the State's authorities and would be unenforceable. A breach of such an unauthorized provision would not support an action for damages resulting therefrom.

We now come to the second ground urged by plaintiff—that of a promise by defendant not to "resort to wholesale cancellation," mentioned in the second amendatory letter. It will be noted by the letter

of February 13, 1946, that in the same sentence in which that clause is found this is said: "* * * but in the event that we (defendant) should choose to withdraw we will give ten (10) days notice and proceed to cancel a proportionate part of the account as it can be replaced by the mortgagee. However, we do reserve the right to decline the acceptance of any risks submitted to us through this source, and cancel any business which we find to be undesirable."

It is the universal rule of construction in this state that an instrument will be viewed in its entirety and that no single part, sentence or clause when considered alone will control. Citizens National Bank v. Texas & P. R. Co., 136 Tex. 333, 150 S.W.2d 1003. If it can be done, meaning will be given to each and every part of the language used. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504. Instruments will be construed so as to give effect to every part thereof if it can be done, each clause being considered both separately and in connection with all other parts, to arrive at the intention of the parties. North v. North, Tex.Civ.App., 2 S.W.2d 481, 483, approved by the Supreme Court in Brown v. Payne, 142 Tex. 102, 176 S.W.2d 306, 308. It will be presumed that every provision of a contract was incorporated for a purpose and will be considered when arriving at an understanding of the whole. Fink v. Brown, Tex.Com.App., 215 S.W. 846, 849. See also 10 Tex.Jur., p. 284, sec. 164, and 3 Tex.Jur. 10 year supplement, p. 265, sec. 164, and cases there cited.

Bearing in mind all applicable rules of construction, when defendant promised not to resort to wholesale cancellation of Pacific's line of insurance (whatever "wholesale" in that connection means), such expression went especially to the manner and time of such cancellations. In each letter as well as in the policies issued, defendant definitely reserved the right to cancel any business which it considered undesirable. As to the time of such cancellations, if they did occur, they should be after giving ten days notice of its intention to cancel, and then it would "proceed to cancel a proportionate part of the account as it can be replaced by the mortgagee." As above pointed out, all such cancellations were replaced by the mortgagee within the allotted time. We think no other reasonable interpretation can be placed upon the terms of the original contract as amended by the two letters than that given it by us. If we are correct in this, the contract was not breached.

Defendant's motion for an instructed verdict embraced substantially all of the uncontroverted facts above enumerated by us. The motion was overruled by the trial court. We hold that such ruling was error. Defendant has preserved the point in every available form and points 1, 2, and 3 in its brief bring it before us. There are other points presented on this appeal which go to the submission of any fact issue, the manner of their submission and complaints of explanations and definitions submitted. Believing as we do, that the motion for an instructed verdict should have been sustained, it becomes unnecessary for us to pass upon other points of assigned error.

We therefore reverse the judgment of the trial court and render judgment for defendant, as the trial court should have done. Reversed and rendered.