NO.
12-05-00047-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

AMERICAN MEDICAL ENTERPRISES, §                      APPEAL
FROM THE 

INC.
d/b/a A.M.E. LABORATORIES,

APPELLANT

 

V.                                                                    §                      COUNTY
COURT AT LAW #2

 

 

JUDI
DUNAGEN ROWLEY,

APPELLEE                                                   §                      SMITH
COUNTY, TEXAS

                                                         
                                                                                                  

MEMORANDUM OPINION

            Appellant
American Medical Enterprises, Inc. d/b/a A.M.E. Laboratories appeals a judgment
entered in favor of Appellee Judi Dunagen Rowley following a bench trial.  AME raises three issues on appeal.  We reverse and render.

 

Background

            Rowley approached AME, a company
that performs laboratory testing for medical facilities, about obtaining a
sales position.  AME agreed to hire
Rowley, but Rowley insisted that her compensation be stated in writing.  Rowley requested a compensation contract
because after she had worked to obtain a number of new clients, her former
employer wanted to transfer her to another position where she would not receive
commissions.  After meeting with Joe
Bowman,[1]
one of AME’s partners, Rowley and Bowman executed a contract outlining Rowley’s
job duties and compensation.  The
contractual terms appear on one page. 
The contract provided that AME would pay Rowley a base salary of
$30,000.00.  AME also promised to pay
Rowley a  7% commission on “net new
business” for the first twelve months as long as Rowley achieved her monthly
quota of $5,000.00 in net new business. 
Additionally, AME promised to pay Rowley a 3% retention bonus on net new
business after Rowley had been with AME for twelve months.  Specifically, AME agreed to  pay “3% of the [net new] business months 13
and after as long as they are a client of AME.” 
Attached to the contract is a one page model worksheet, which includes
sample calculations illustrating the sales and commission structure described
in the contract.

            After Rowley worked for AME for
fourteen months, AME fired her upon learning that  Rowley and her husband had formed a business
that would be competing with AME.  
Almost four years later, Rowley sued AME for breach of contract,
claiming that AME’s obligation to pay the 3% commission did not end with her
termination, but continued for the rest of her lifetime.  In a bench trial, the trial court concluded
that AME breached the contract.  The
court awarded Rowley $214,266.66 in past commissions, $60,258.83 in prejudgment
interest, and $787,090.84 in future commissions.  The court also awarded Rowley $400,543.00 in
attorney’s fees.  AME filed a motion for
judgment notwithstanding the verdict or, alternatively, a motion for new
trial.  The trial court denied AME’s
motion, and this appeal followed.

 








Interpretation of Unambiguous Contract

            In
its first issue, AME asserts the trial court erred in failing to find as a
matter of law that the contract was intended to apply only while Rowley was
working for AME and was not intended to provide for posttermination
compensation.  Rowley contends that the
contract provided for a lifetime commission of 3%, regardless of her employment
status with AME.

Applicable Law








            The
primary concern in the interpretation of written contracts is to ascertain and
give effect to the intentions of the parties as expressed within the four
corners of the instrument.  R &
P Enter. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518
(Tex. 1980).  Under Texas law, a contract
is ambiguous only when application of applicable rules of interpretation to the
contract leave it genuinely uncertain which one of two meanings is the proper
meaning.  Id. at 519.  A contract is not ambiguous because it
suffers from mere uncertainty or lack of clarity.  J. M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 240 (Tex. 2003).

            Here,
both parties agree that the contract is unambiguous.  Accordingly, the intent of the parties must
be determined as a matter of law by the court from the plain language of the
contract.  Allison v. Nat’l Union
Fire Ins. Co., 734 S.W.2d 645, 646 (Tex. 1987).  To achieve this object, we will examine and
consider the entire contract so that none of the provisions will be rendered
meaningless.  R & P Enter.,
596 S.W.2d at 519.  If the language used
in the contract is susceptible of two constructions, we will adopt the
interpretation that renders the contract fair and reasonable, rather than an
interpretation that leads to unreasonable, oppressive, ridiculous, or inequitable
results.  See Portland Gasoline Co.
v. Superior Mktg. Co., 150 Tex. 533, 534, 243 S.W.2d 823, 824 (1951),
overruled on other grounds, 986 S.W.2d 603, 608 (Tex. 1998). 

            As
a general rule, it is not proper to rely on a single clause alone when attempting
to ascertain the meaning of the contract. State Farm Life Ins. Co. v.
Beaston, 907 S.W.2d 432, 433 (Tex. 1995). We presume that the parties
intended every clause to have some effect when interpreting a contract; thus,
we consider each part of the document with every other part of the document so
that the effect and meaning of one part on any other part may be determined.  See Consol. Petroleum Partners, I,
LLC v. Tindle, 168 S.W.3d 894, 898-99 (Tex. App.–Tyler 2005, no
pet.).  We give terms their plain,
ordinary, and generally accepted meaning unless the document shows that the
parties used terms in a technical or different sense.  Id. at 899.  We enforce an unambiguous contract as
written.  Id.  We cannot rewrite or change the contract
simply because we or one of the parties comes to dislike its provisions or
thinks that something else is needed in it. 
Id.  Parties to a
contract are masters of their own choices and are entitled to select the terms
and provisions to include or omit from a contract.  Id.

            When
interpreting the provisions of a contract, we may consider the circumstances
surrounding the execution of the contract regardless of whether or not the
contract is ambiguous.  Balandran
v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998).  Additionally, multiple documents, executed at
the same time as part of the same transaction and for the same purpose, may be
construed together.  Jim Walter
Homes, Inc. v. Schuenemann, 668 S.W.2d 324, 327 (Tex. 1984).  Unsigned documents may be incorporated into
and become part of a written contract.  Owen
v. Hendricks, 433 S.W.2d 164, 166 (Tex. 1968).  Even if the parties executed the instruments
at different times and the instruments do not expressly refer to each other, we
may determine that, together, they comprise a written contract in ascertaining
the parties’ intent.  Fort Worth
Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex.
2000).  

            We
review the interpretation of an unambiguous contract de novo.  See Tindle, 168 S.W.3d at 898
(citing MCI Telecomm. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d
647, 650-51 (Tex. 1999)).  In a de novo
review, we accord no deference to the lower court’s decision.  Quick v. City of Austin, 7
S.W.3d 109, 116 (Tex. 1998).  

The Contract

            In
this case, the parties agree that the contract is unambiguous, but each
interprets its language differently.[2]   Neither concedes that its interpretation of
the relevant passages is any less reasonable than the other party’s
interpretation.  The contract[3]
states as follows:

 

Sales Representative Job Description

Achieve
sales quota on a monthly basis.

Quota is
$5000 per month net in new business.

 

                Service existing clients to ensure continued business
with AME.

Retention
bonus equal to 3% of new business after 12 months continuous service.

 

Communicate
with Tyler management and inside personnel and outside phlebotomists on a
routine basis as necessary to keep any existing business.

 

Communicate
with Owners in Lubbock on a weekly basis [regarding] any pertinent information
including accomplishments and future goals.

 

Reward for Achieving Quota:

7% of
net new business per month for 12 months.

3% of
the above business months 13 and after as long as they are a client of AME.

(See
attached model worksheet.)

 

Disciplinary Action if quota not
met:

First
month not meeting quota, verbal warning.

Second
consecutive month, written warning.

Third
consecutive month, Termination.

 

/s/ Judi Dunagen                  /s/Joe
Bowman

 

Base
salary to be $30,000 per year. JB [Handwritten
term added to contract, initialed by Joe Bowman]

 

 

            Rowley
concedes that she was an at will employee and that she was not entitled to 7%
of net new business per month after AME terminated her.  This appeal concerns payment of the 3%
retention bonus, which is referred to in the first two sections of the
contract.  AME argues that its obligation
to pay Rowley 3% of net new business “months 13 and after as long as they are a
client of AME” ended with Rowley’s termination. 
Rowley contends that the phrase, “as long as they are a client of AME,”
means that AME must pay her 3% for the remainder of her lifetime for as long as
her clients continue to do business with AME. 


Analysis

            As
a preliminary matter, we agree with the parties that the contract is
unambiguous.  However, we are unable to
conclude that Rowley’s interpretation of the contract language is
reasonable.   

            The
contract is divided into three sections. 
The first section, “Sales Representative Job Description,” required
Rowley to achieve a sales quota of $5,000.00 in net new business each
month.  In addition, she was to service
AME’s existing clients and regularly communicate with AME’s Tyler personnel and
AME’s Lubbock owners.  In return, she
would  receive a “retention bonus equal
to 3% of new business after 12 months continuous service.”  

            The
second section, “Reward for Achieving Quota,” describes how Rowley’s
compensation would be calculated.  For
the first twelve months, AME would pay Rowley 
7% of net new business per month. 
AME would also pay Rowley  “3% of
the [net new] business months 13 and after as long as they are a client of AME.”
This 3% appears to be the same 3% that is referred to in the first section as a
“retention bonus.”  

            The
second section also includes a reference to a model worksheet, which is
attached to the contract and marked “example.” 
The worksheet contains illustrations of how Rowley’s 7% commission and
3% retention bonus would be calculated. 
The worksheet lists seventeen consecutive months and includes columns
for new business, the 7% commission, the 3% retention bonus, and total
compensation.  For each month, including
months thirteen and after, the new business column  reflects Rowley’s $5,000.00 sales quota.  Additionally, Rowley’s total compensation for
months thirteen and after includes a 3% retention bonus in addition to the 7%
monthly commission on her $5,000.00 sales quota.  

            The
third section, “Disciplinary Action if quota not met,” provides that if Rowley
failed to meet her quota for three consecutive months, she would be
terminated.  

            In
our view, all of the terms relate to the time Rowley was employed by AME.  Rowley was entitled to a 7% commission if she
met her monthly sales quota of $5,000.00 net new business.  After twelve months of continuous employment,
she was also entitled to 3% of net new business as a retention bonus in
addition to her 7% commission.  The
worksheet calculations show that during the months in which the retention bonus
was payable, Rowley’s 7% commission for meeting her sales quota was included as
part of her total compensation.  These
calculations are consistent with the language in the second section, that both
the 7% commission and the 3% retention bonus are Rowley’s “reward” for
achieving her quota.  The worksheet does
not include a scenario in which Rowley is no longer employed with AME but
continues to receive the 3% retention bonus. 

            On
the other hand, the contract clearly states that the retention bonus was
payable on net new business “months 13 and after as long as they are a
client of AME.”  (Emphasis
added.)  At first glance, this phrase
appears to conflict with the other contract terms.  However, the circumstances surrounding the
execution of the contract provide further illumination.  

            Rowley
testified at trial that she asked AME to provide the compensation contract so
that history did not repeat itself.  She
testified that her former employer, like AME, hired her to bring in clients for
its laboratory services division.  This
employer offered a declining, and ultimately disappearing, commission structure
– 5% in the first year, 2% in the second year, and 0% the third year and
thereafter.  Rowley commented that she
would be “out of business” in three years with this commission structure.  However, after eighteen months there, she was
asked to move to a different position within the company and forfeit her
commissions.  Rowley did not want to move
to the other position because she had worked to obtain the new clients and did
not want to forfeit her commissions. 
Consequently, she went to work for AME, but only after signing the
compensation contract.

            In
light of this testimony, we conclude that the phrase, “as long as they are a
client of AME,” relates to and precludes the situation that occurred with her
former employer.  As such, if Rowley was
no longer in a sales position but was still employed by AME, she would receive
the retention bonus for any of the clients she had acquired who remained
clients of AME.  Under Rowley’s
interpretation, she could have resigned from AME to take a better position
elsewhere and still receive 3% from AME for the rest of her lifetime.  We do not believe that the parties intended,
nor do we interpret the phrase to mean, that AME intended to provide a “golden
parachute” to Rowley should she leave AME’s employment, whether voluntarily or
otherwise.  If AME had intended to reward
Rowley for the rest of her life for the clients she brought to AME, regardless
of her employment status, the contract could have included language clearly
stating that intention.  The language of
this contract does not reflect such an intention. 

Conclusion

            In our view, the reasonable
interpretation of the contract provides that, as a reward for over twelve
months of continuous service with AME and meeting the specified quota, Rowley
would be paid 3% of the net new business. 
The phrase, “as long as they are a client of AME,” assured Rowley that,
regardless of her position within the company, she would still receive the 3%
retention bonus if the clients she brought to AME continued to do business with
AME.  This interpretation considers the
entire contract and surrounding circumstances, does not rely on a single
clause, and renders the contract fair and reasonable.  After AME terminated Rowley, she was no
longer entitled to the 3% retention bonus. 
Accordingly, we sustain Appellant’s first issue.

            Having sustained Appellant’s first
issue, we need not address its remaining issues.[4]  See Tex.
R. App. P. 47.1.  Accordingly, we reverse
the trial court’s judgment and render judgment that Rowley take
nothing from AME.

                                                                                                    DIANE DEVASTO   

                                                                                                                 Justice

 

Opinion delivered March
31, 2006.

Panel consisted of Worthen, C.J., DeVasto, J., Ramey,
Retired C.J., Twelfth Court of Appeals, sitting by assignment.

 

 

(PUBLISH)











[1] Mr. Bowman died before
the filing of this suit.





[2] Ambiguity does not
arise simply because the parties promote conflicting interpretations of the
contract.  See Tindle, 168
S.W.3d at  899.  Ambiguity is an issue that must be raised by
the pleadings.  Covered Bridge
Condo. Ass’n, Inc. v. Chambliss, 705 S.W.2d 211, 214 (Tex. App.–Houston
[14th Dist.] 1985, writ ref’d n.r.e.). 
However, a court may conclude that a contract is ambiguous even in the
absence of such a pleading by either party.   Sage St. Assoc. v. Northdale Constr. Co.,
863 S.W.2d 438, 445 (Tex. 1993).





[3] AME contends that we should consider two other
documents as part of the contract because they were created contemporaneously
with the executed one page contract. 
These documents are one page of questions posed by Rowley and one page
of responses to Rowley’s questions, signed by Joe Bowman.  Although we may consider these documents part
of the contract, Fort Worth Indep. Sch. Dist., 22 S.W.3d at 840,
nothing in the documents alters the conclusions we reach after considering only
the one page contract and the attached sample worksheet.  Thus, we need not discuss the other
documents.

 





[4] AME’s second and third
issues challenged the court’s finding that AME breached the contract and the
court’s award of damages, respectively.