**Wayne SPECHT, Plaintiff,**

v.

**MAXIMUS, INC., Defendant.**

**No. A–07–CA–192–SS.**

United States District Court,
W.D. Texas,
Austin Division.

Dec. 26, 2007.

Michael D. Myers, Robert H. Espey II, Philip B. Berry, McClanahan & Clearman LLP, Houston, TX, for Plaintiff.

Dale L. Roberts, Rick Harrison, Fritz, Byrne, Head & Harrison, LLP, Austin, TX, for Defendant.

### *ORDER*

SAM SPARKS, District Judge.

BE IT REMEMBERED on the *26th* day of December 2007 the Court reviewed the file in the above-styled cause, specifically Plaintiff's Motion for Summary Judgment [# 12], Defendant's Response and Motion to Seal Response thereto [# 21, 22], and Plaintiff's Reply [# 25]. Having considered these documents, the applicable law, and the case file as a whole, the Court GRANTS summary judgment on behalf of the Plaintiff for the reasons that follow.

### Background

Defendant Maximus, Inc. is an organization with multiple subdivisions. In 2003, Maximus created a new marketing subdivision called the Capital Cities Group (Capital Cities). Decl. Jack Ginsberg, Resp. Ex. A, ¶ 2. Capital Cities' primary function was to "creat[e] new opportunities for Maximus to sell its goods and services to

state agencies." *Id.* at ¶ 3. Plaintiff Wayne Specht was hired from another division within Maximus to become the "Marketing Executive for the State of Texas" for Capital Cities. *Id.* at ¶ 4. The parties agree Specht's job description and compensation structure are "outlined in annual the Goal Letters that were part of [Specht's] annual performance review." *Id.* at ¶ 5.

Specht's Goal Letters for both 2004 and 2005 contain identical language concerning his job responsibilities, which include "sell[ing] Maximus products to the State of Texas" and "creat[ing] and/or identify[ing] opportunities within the State of Texas for Maximus to pursue." Resp. Ex. A–2, A–3. Both Goal Letters contain identical commission provisions which state, in relevant part,

> The commission plan is defined as follows for all non-contingency based contracts that you pursue with the approval/concurrence of the appropriate division(s) and/or group(s):
> - Commission rate/factor is 1.25%
> - Commissions are paid on Maximus labor/services and software
> - Commissions are paid quarterly based on cash receipts
> - NO commission payments will be made without the. approval of the appropriate division(s) and/or groups using the "Opportunity Approval Request."
> - NO commission payments will be made if you decide to voluntarily leave Maximus or transfer outside the Corporate Marketing organization. (All commission payments will stop at that time.)
> - Commission payments associated with a given contract will NOT exceed $300K.

*Id.* The goal letters are the only written memoranda in the record specifically concerning the agreement between Specht

and Maximus, but the parties agree Specht was paid a yearly salary in addition to any commissions.

During February and March of 2004, Specht submitted an "Opportunity Approval Request" (OAR) to his immediate supervisor, Jack Ginsburg, the Vice President of Corporate Marketing and Business Development for Capital Cities. Specht Decl. ¶ 6, Mot. Summ. J. Ex. A; OAR, Mot. Summ. J. Ex. A–4. The OAR identified an opportunity, created through Texas legislation, to "establish at least one but not more than four call centers for the purposes of determining ... a person's eligibility and need for services related to the State's Medicaid, Food Stamps, TANF, and Long–Term Care." Mot. Sum. J. Ex. A–4. The project further called for the creation of "automated tools to support online screening, application, and eligibility" for these benefits. *Id.*

The OAR described "Capital Cities Projected Role" as a "lead role in developing call center implementation strategy" and "determining teaming partners and assembling a winning team ..." *Id.* The OAR identified other Maximus subgroups as part of the "capture team" for bidding the project, including Maximus' Health Services—Health Systems group, its Human Services—Human Services Operations group, and its Technical Services—Technology Support group. *Id.* The OAR did not address the possible role in the execution of the project of any Maximus subgroup other than Capital Cities, and in fact contemplated that Capital Cities would pursue "identification" of unidentified, appropriate "teaming partners" for the execution of the call center project. *Id.*

Ginsberg approved and signed the OAR, as did John Lau, the President of Maximus' Health Services—Health Systems Division. Mot. Summ. J Ex. B–1. The date of these approvals is not clear from the

record, but approval of the OAR triggered a series of negotiations between Maximus, the State of Texas, and possible "teaming partners" that culminated in July 2005 award of what Maximus' CEO described as "one of the largest, if not the largest, projects that [Maximus] ha[s] ever won." July 5, 2005 Davenport email, Mot. Summ. J. Ex. A–5. In the CEO's email announcing the deal, she specifically noted Wayne Specht's contribution to the project. *Id.*

On November 09, 2004, Ginsberg wrote an email to David Casey, the President of Maximus' Corporate Marketing division, stating "Based on the 'Capital Cities' commission plan approved by D. Mastran, Wayne Specht is eligible to earn commissions for Texas IE." Mot. Summ. J. Ex. B–2. The parties agree "Texas IE" refers to the OAR described above. On November 14, 2005, Ginsberg further explained to Casey that commission under the Capital Cities plan is due because "Opportunity approval requests have been submitted, reviewed, and approved for a number of campaigns. The most notable of which are Texas Eligibility, Michigan Eligibility, and Michigan MMS." *Id.* The parties agree Texas Eligibility refers to the OAR described above.

Nevertheless, Maximus now argues Specht is entitled to no commission on the Texas Eligibility OAR because Specht failed to obtain "the approval of the appropriate division(s) and/or group(s) using the 'Opportunity Approval Request,'" a necessary precondition to his eligibility for a commission. Though Maximus concedes the Vice President of Corporate Marketing and Business Development for Capital Cities and the President of Maximus' Health Services—Health Systems Division both signed and approved the OAR, Maximus contends Specht was obligated to obtain approvals from all Maximus "divisions, groups, and/or strategic business units that had profit and loss responsibility for a project." Resp. at 2–3. Maximus contends, at a minimum, Specht should have obtained approvals from the following groups:

Corporate Marketing–Business Development–Capital Cities

Health Systems Division

Workforce Services Division

Health Services Group

Human Services Group

President and Chief Operating Officer.

Ginsberg Decl. ¶ 14, Resp. Ex. A. Maximus insists this should have been obvious from the language "approval of the appropriate division(s) and/or group(s)" in the Goal Letters. *Id.* at 5. Alternatively, Maximus contends a presentation and handout including the phrase "the State Marketing Executive will be compensated for opportunities that have been approved by the Divisions/Groups/SBU's (as applicable)" should have put Specht on notice that he need each of these approvals.

It is undisputed that, notwithstanding the lack of OAR approval from these departments, Maximus pursued and won a role in the Texas project, Specht was a key player in those negotiations, and Maximus has received more than $24 million in payment for its role in that project to date. Maximus has paid no commission on the Texas project to Specht, and terminated Specht's employment in February of 2007.

## Analysis

### I. Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R.CIV.P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.,* 83 F.3d 96, 98 (5th

Cir.1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). First, the moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED.R.CIV.P. 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996).

## II. Breach of Contract claim

■ The elements of a breach of contract claim under Texas law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 353 (Tex.App.Corpus Christi 2002, pet. denied). The parties in this case both acknowledge the existence of a valid contract and performance by Specht of all his

duties as Marketing Executive for the State of Texas. The parties differ on whether Specht performed all conditions precedent for the payment of commission on the Texas Eligibility project.

■■ In construing a contract under Texas law, a court is to determine, as a matter of law, whether the contract is ambiguous. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003). "If contract language can be given a certain or definite meaning, then it is not ambiguous; it should be interpreted by a court as a matter of law." *Universal Health Servs., Inc., RCW v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (citations omitted). "[A]n ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction." *Id.* Where there is only one reasonable interpretation of the language, it is not ambiguous. *Webster*, 128 S.W.3d at 229.

■ When interpreting a contract, "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Webster*, 128 S.W.3d at 229 (citations omitted). To determine the parties' true intentions, a court is to "consider each part of the document with every part of the document so that the effect and meaning of one part on any other part may be determined." *Consol. Petroleum, Partners, I, LLC v. Tindle*, 168 S.W.3d 894, 898–99 (Tex.App.Tyler 2005, no writ) (citation omitted). An unambiguous agreement is enforced as written and a court "cannot change the contract simply because [it] or one of the parties comes to dislike its provisions." *Tindle*, 168 S.W.3d at 898–99.

The parties agree the commission arrangement between Specht and Maximus is fairly summarized in the Goal Letters. The parties disagree only on the meaning

of the term "appropriate division(s) and/or group(s)." Specht contends he received approval from his direct supervisor on behalf of his group, Capital Cities, as well as approval from Lau, the "capture manager" for the Texas Eligibility project. He asserts these are spokesmen for the "appropriate divisions" at the opportunity approval stage.

In contrast, Maximus contends the "appropriate divisions" are all Maximus "divisions, groups, and/or strategic business units that had profit and loss responsibility for a project." Resp. at 2–3. This reading of the agreement between Specht and Maximus is untenable for the simple reason that it would have been impossible to determine, at the time the OAR was submitted for approval, which subdivisions of Maximus other than Capital Cities would ultimately have any involvement in the project. The OAR approved by Ginsberg and Lau called for outsourcing and "teaming" arrangements from the outset. Mot. Summ. J. Ex. A–4. Ultimately, Maximus was awarded the project as a subcontractor to another company, Accenture, LLP. Mot. Summ. J. Ex. A–5. This arrangement was finalized after months of negotiations, during which time the possible roles of Maximus divisions and subgroups in executing the project were quite fluid. *See* Resp. Ex. B–1; Resp. Ex. Cp. 43–44. To say that Specht was responsible for identifying each subdivision of Maximus that might ultimately sustain profit and loss from the Texas project and obtaining each of those approvals before pursuing the project is, at best, a highly strained reading of the phrases "appropriate division(s)" and "as applicable."

■ Whether Specht's broader reading of the OAR approval clause is correct is, on the facts in this record, beside the point. To the extent Maximus intended to require a more stringent approval process than Specht provided, Maximus waived that reservation by its conduct in pursuing the OAR as written by Specht and using Specht's services in the subsequent negotiations to secure the contract. Under Texas law, waiver is "an intentional relinquishment of a known right or *intentional conduct inconsistent with claiming that right.*" *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003) (per curiam) (quoting *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987)). In this case, Maximus had a right to condition payment of commission on the approval of an OAR by "appropriate division(s) or group(s)." Far from indicating to Specht that his OAR was deficient, representatives of Maximus took the exact plan identified in the OAR and developed it into a sophisticated proposal that utilized the resources of several subdivisions of the company. The CEO of the company specifically acknowledged that the opportunity identified by Specht was "a credit to our entire firm and everyone in the firm." Mot. Summ. J. Ex. A–5. This intentional conduct can only be read as wholehearted approval of the opportunity identified by Specht.

■ Under Texas law, "waiver by implication should not be inferred contrary to the intention of the party whose rights would be injuriously affected thereby, unless the opposite party has been misled to his or her prejudice." *Barua v. County of Dallas,* 100 S.W.3d 629, 634 (Tex.App.2003, pet.denied). In this case, Maximus' silence on the approval issue, coupled with its intentional pursuit of the Texas Eligibility project, misled Specht to his detriment. The time for Maximus to assert its "opportunity approval" objections would have been at the "opportunity" stage, when Specht presumably could have retooled and resubmitted his OAR properly. Instead, Maximus intentionally acted on the opportunity as originally presented by

Specht, and was silent about any "opportunity approval" issues until that opportunity had matured into an executed contract with the state of Texas netting Maximus over $24 million dollars. The record establishes Specht reasonably relied on the approvals signed by Ginsberg and Lau as representatives of Maximus. *See Cox v. Bancoklahoma Agri–Service Corp.,* 641 S.W.2d 400, 404 (Tex.App.1982) ("One of the elements of the affirmative defense of waiver is reliance by the party claiming waiver.") On these facts, Maximus was not entitled to withhold payment of Specht's commission.

Specht asserts he is entitled to $300,000 in commission Maximus has not contested the amount of commission claimed by Specht, but has only argued he failed to satisfy the approval condition and is therefore entitled to no commission. Since the record establishes Specht reasonably relied on Maximus' representation that the OAR was approved, Maximus cannot rely on the approval clause to bar payment. Accordingly, Specht is entitled to the commission owed in the amount of $300,000.

IT IS ORDERED that Specht's Motion for Summary Judgment [# 12] is GRANTED.

IT IS FURTHER ORDERED that the parties shall have **fifteen (15) days** from the entry of this order to confer and reach agreement on the issue of attorney's fees in the case. If the parties cannot reach agreement, they may submit further briefing on the issue of attorneys' fees within **ten (10) additional** days. The timeline for responses and replies under local rule CV–7 will apply to any such briefing.

IT IS FINALLY ORDERED that all other motions pending in the above-styled case are DISMISSED as MOOT.